1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ROBERT WESTFALL, et al.,                    No. 2:16-cv-02632-DAD-CKD

12                  Plaintiffs,

13          v.                                    ORDER GRANTING PLAINTIFFS' MOTION
                                                  FOR PRELIMINARY APPROVAL OF
14   BALL METAL BEVERAGE                          CLASS ACTION SETTLEMENT
     CONTAINER CORPORATION,
15                                                (Doc. No. 218, 221)
                    Defendant.
16

17

18          This matter is before the court on plaintiffs' motion for preliminary approval of class

19   action settlement of their wage and hour class action lawsuit against defendant Ball Metal

20   Beverage Container Corporation.  (Doc. No. 218.)  On February 18, 2025, plaintiffs' motion was

21   taken under submission on the papers pursuant to Local Rule 230(g).  (Doc. No. 220.)  For the

22   reasons explained below, the court will grant plaintiffs' motion.

23                                          **BACKGROUND**

24          As summarized in the pending motion, on September 7, 2016, plaintiff Robert Westfall

25   filed his action in Solano County Superior Court asserting state law claims and seeking penalties

26   under California's Private Attorneys General Act ("PAGA").  (Doc. No. 218-1 at 7.)  Defendant

27   subsequently removed the action to this federal court.  (*Id.*)  On April 6, 2017, plaintiffs filed their

28   First Amended Complaint ("FAC").  (*Id.*)  On February 5, 2018, the previously assigned district

                                                  1

judge granted class certification, thereafter, amending and expanding that grant of class

certification on January 15, 2019.  (*Id.*)

On December 11, 2019, plaintiffs and defendant reached a resolution of this action.  (*Id.* at

8.)  On September 16, 2021, the previously assigned district judge granted preliminary approval

of the parties' class action settlement.  (Doc. No. 104.)  Plaintiffs submitted a motion for final

approval of the settlement on April 15, 2022.  (Doc. No. 218-1 at 8.)  Richard Martin and Andrew

Bernstein (collectively "Objectors" or "Objectors-Intervenors") filed objections to the settlement

reached by plaintiffs and defendant before the January 17, 2023 final approval hearing, and final

approval was denied by the undersigned[1] for reasons discussed later in this order.  (*Id.*; *see also*

Doc. No. 164.)

In total, the parties attended four mediations spanning the period from 2017 to 2023.

(Doc. No. 218-1 at 19.)  The parties participated in full-day mediations with Alan Berkowitz on

February 7, 2017 and August 1, 2018, with the Honorable Raul Ramirez (Retired) on December

11, 2019, and with Jeffrey Ross on August 30, 2023.  (*Id.*)  The final mediation in August 2023

extended well into the evening before reaching a resolution based upon a mediator's proposal.

(*Id.*)  Plaintiffs represent that the negotiations were "adversarial, though still professional in

nature."  (*Id.*)  The parties also engaged in substantial discovery, including taking the depositions

of approximately 24 class member and exchanging thousands of pages of documents covering

wage and hour policies, timekeeping and pay data, personnel files, and other documentation

necessary to evaluate both liability and damages.  (*Id.*)

On May 30, 2024, plaintiffs filed their Second Amended Complaint ("SAC").  (*Id.* at 8.)

On January 21, 2025, plaintiffs, with the support of the prior Objectors, filed a second motion for

preliminary approval of class action settlement.  (Doc. No. 218.)  Plaintiffs attached thereto their

executed long-form Joint Stipulation of Class Action and PAGA Settlement (the "Settlement

Agreement").  (Doc. No. 218-3 at 28–67.)  That same day, the parties uploaded a copy of the

proposed settlement to the Labor and Workforce Development Agency ("LWDA") website.

[1]  This case was reassigned to the undersigned on August 25, 2022.  (Doc. No. 136.)

(Doc. No. 218-1 at 8.)  On February 3, 2025, defendant filed a statement of non-opposition to plaintiff's motion for preliminary approval.  (Doc. No. 219.)  On July 22, 2025, plaintiffs filed a request for status regarding their motion for preliminary approval.  (Doc. No. 221.)

**THE PROPOSED SETTLEMENT**

**A.    The Class**

For settlement purposes, plaintiffs define the scope of the settlement class (the "Class" or "Class Members") as:  "all persons employed by Defendant Ball in a Class Position, at any time during the Class Period."  (Doc. No. 218-1 at 10.)  The Class Position "shall mean a position for which workweeks are eligible as a 'Class Member Work Week' or as a 'Engineering Class Member Work Week.'"  (Doc. No. 218-3 at 36.)  Class Member Work Week "shall mean a Work Week in which a Class Member was employed by Defendant in California during the Class Period in a non-exempt employment position as an 'Machinist/Mechanic,' and/or 'Maintenance,' or a non-exempt position within the production, and production support departments, at Defendant's facility located in Fairfield California, or in a functionally equivalent and supporting non-exempt position (but excluding Chemical Processors, Quality Assurance or Production Lead [formerly known as Production Chief] positions, or 'Electronic Tech,' 'Electronic Technician,' 'ET' positions)."  (*Id.* at 35.)  Engineering Class Member Work Week "shall mean a Work Week during the Class Period in which a Class Member was employed by Defendant in California, at Defendant's facility located in Fairfield, California, in a non-exempt 'Engineering Position,' defined as Chemical Processor, Quality assurance or Production Leads (formally known as Production Chiefs) positions, or 'Electronic Tech,' 'Electronic Technician,' 'ET,' or functionally equivalent non-exempt positions in the Engineering Department (and in which the Class Member was not classified as employed in a non-Engineering position during any portion of the workweek)."  (*Id.*)

/////

/////

/////

/////

3

1    **B.**    **Aggrieved Employees Under the PAGA**

It appears that the parties have implicitly defined Aggrieved Employees under the PAGA similarly to their description of the settlement class, but as subject to the PAGA period and not the Class period.[2]

**C.**    **Class Period**

As stated in the parties' Settlement Agreement, the Class Period "shall mean the time period from September 7, 2012 through April 20, 2024." (Doc. No. 218-3 at 36.) The PAGA Period "shall mean the period from July 4, 2015 to April 20, 2024." (*Id.* at 43.)

**D.**    **The Release of Claims**

As to the release of claims, the Settlement Agreement provides:

> In exchange for the consideration recited in this Settlement, Named Plaintiffs, Objectors-Intervenors, and all Eligible Class Members on behalf of themselves and on behalf of all who claim by or through them or in their stead, for the period from September 7, 2012 to the April 202024 do hereby and forever release, acquit and discharge and covenant not to sue Defendant, and each of its respective attorneys, past, present and future divisions, affiliates, predecessors, successors, shareholders, officers, directors, employees, agents, trustees, representatives, administrators, fiduciaries, assigns, subrogees, executors, partners, parents, subsidiaries, joint employers, co-employers, payroll service providers, staffing agencies, Professional Employer Organizations ("PEO's"), Administrative Service Organizations ("ASO's"), insurers, related corporations, and/or privies, both individually and collectively, and any individual or entity which could be jointly liable with Defendant (referred to as the "Released Parties") for any and all claims, debts, promises, agreements, actions, causes of actions, suits, losses, expenses, and liabilities (based upon any legal or equitable theory, whether contractual, common law, statutory, federal, state or otherwise), arising from or that could have reasonably been asserted based on the allegations in the Complaint (Exhibits 1-A, 1-B, and 1-C hereto), for:
>
> (1) Failure to pay wages owed, including claims for: the failure to properly pay all minimum wages (including any and all theories as alleged, or that could have been alleged by Plaintiffs or Objectors-Intervenors related to "off the clock work" or incorrect calculation of the regular rate of pay"); failure to pay all overtime wages (including any and all theories as alleged, or that could have been alleged, by Plaintiffs and Objectors-Intervenors related to the failure to pay overtime at the "regular rate of pay"); and the failure to pay vested vacation or sick pay wages

---

[2] The parties are directed to specifically inform the court in their motion for final approval how the parties intend to define the group of Aggrieved Employees under the PAGA.

1     (including at the regular rate of pay);

2         (2) Failure to provide meal periods;

3         (3) Failure to authorize and/or permit rest periods;

4         (4) Failure to pay "premiums" related to meal and/or rest periods
          pursuant to Cal. Lab. Code § 226.7 at the regular rate of pay;

5
          (5) Failure to furnish accurate, itemized wage statements in
6         compliance with California Labor Code § 226(a);

7         (6) Failure to pay all wages upon separation of employment;

8         (7) Alleged violation of and/or based on California Labor Code
          §§ 200, 201-203, 204, 210, 218, 218.5, 218.6, 221, 223, 226,
9         226(a), 226.3, 226.7, 227.3, failure to pay sick time, including at
          the regular rate of pay, and any claim for PAGA penalties
10        predicated thereon under § 246 et seq, 500, 510, 511, 512, 515,
          558, 1174, 1174.5, 1175, 1182.11, 1182.12, 1185, 1193.6 1194,
11        1194.2, 1197, 1197.1, 1198, 1199, 3289, 3751, as well as, to the
          extent predicated on "regulatory violations," "general
12        violations," or "repeat violations" associated with "IC spray"
          practices and procedures, Labor Code §§ 6300, et seq. (OSHA
13        Standards), and Sections 3, 4, 5, 7, 11, and 12 of the IWC Wage
          Orders;
14
          (8) Alleged violations of the California Unfair Competition Law
15        (Business and Professions Code sections 17200 et seq.); and

16        (9) Violation of any provision of the California Labor Code that are
          subject to penalties pursuant to the California Labor Code Private
17        Attorneys General Act of 2004 that were or could have been
          asserted based on the allegations in the Complaint, as well as
18        PAGA penalties that were or could have been sought in relation
          to violation of such provisions. This includes the §§ 6300 PAGA
19        claims alleged by Objector Martin in the Martin Action.

20   (Doc. No. 218-3 at 151–52.)  "Such release of Released Claims is also intended to apply

21   regardless of whether such claims are known or unknown, and the release . . . shall be deemed to

22   include a waiver and relinquishment of the provisions of Section 1542 of the California Civil

23   Code" for claims meeting the limited definition of "Released Claims."  (*Id.* at 153.)  The

24   Settlement Agreement does not explicitly state that all Aggrieved Employees are subject to the

25   release of PAGA claims, regardless of whether or not they opt out of the Class.

26   **E.    Summary of the Settlement Terms**

27        Under the parties' Settlement Agreement, defendant will pay a gross settlement amount

28   ("GSA") of $4,500,000.00 allocated as follows:  (1) up to $10,000 for settlement administration

                                         5

1    costs; (2) $100,000.00 in civil PAGA penalties, with $75,000 of the penalties payable to the

2    LWDA; (3) up to $1,500,000.00 for attorneys' fees and up to $45,000 for plaintiffs' counsel's

3    documented litigation costs; and (4) $10,000 incentive awards for each named plaintiff and the

4    Objectors-Intervenors.  (Doc. No. 218-1 at 10.)  The GSA funds are non-reversionary, meaning

5    no portion will revert to defendant for any reason.  (Doc. No. 218-2 at 5.)

6            Assuming these allocations are awarded in full, approximately $2,810,000.00 in a net

7    settlement amount will be available for distribution to Class Members who do not submit a timely

8    and valid request to be excluded from the settlement.  (Doc. No. 218-1 at 11.)  The settlement is

9    projected to pay each Class Member an average of $7,223.65.  (*Id.* at 19.)  After the funds are

10   distributed to the Class Members, they will have 180 days to cash their checks.  (*Id.* at 11.)  Any

11   remaining amounts from uncashed checks will be paid to a *cy pres* recipient as agreed upon by

12   the parties, subject to court approval, or to the California State Controller Unclaimed Property

13   Division in the name of the Qualified Claimant.  (*Id.*)

14                                    **LEGAL STANDARDS**

15   **A.      Rule 23 Settlements**

16           Class actions require the approval of the district court before settlement.  Fed. R. Civ. P.

17   23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for

18   purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the

19   court's approval.").  "Approval under 23(e) involves a two-step process in which the Court first

20   determines whether a proposed class action settlement deserves preliminary approval and then,

21   after notice is given to class members, whether final approval is warranted."  *Haro v. Walmart,*

22   *Inc.*, No. 1:21-cv-00239-NODJ-SKO, 2024 WL 1160492, at *4 (E.D. Cal. Mar. 18, 2024) (citing

23   *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004)).

24           The first step in the two-step process is preliminary approval.  During preliminary

25   approval, the court conducts a preliminary fairness evaluation to determine if notice of the class

26   action settlement should issue to class members and, if applicable, whether the proposed

27   settlement class should be certified.  *See* David F. Herr, *Ann. Manual Complex Lit.* § 21.632 (4th

28   ed.).  Under Rule 23(e)(1), the court must direct notice to all class members who would be bound

                                              6

1    by the settlement proposal if the parties show that "the court will likely be able to:" (i) approve

2    the proposal under Rule 23(e)(2)'s fair, reasonable, and adequate standard; and (ii) certify the

3    proposed settlement class. Fed. R. Civ. P. 23(e)(1); *see also Lounibos v. Keypoint Gov't Sols.*

4    *Inc.*, No. 12-cv-00636-JST, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re*

5    *Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)) (noting that federal

6    courts generally grant preliminary approval if "the proposed settlement appears to be the product

7    of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly

8    grant preferential treatment to class representatives or segments of the class, and falls within the

9    range of possible approval").

10           The second step of the process is the final approval. During final approval, "[i]f the

11    proposal would bind class members, the court may approve it only after a hearing and only on

12    finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In doing so, the court

13    must consider several factors, including whether: "the class representatives and class counsel

14    have adequately represented the class"; "the proposal was negotiated at arm's length"; "the

15    proposal treats class members equitably relative to each other"; and "the relief provided for the

16    class is adequate." *Id.* When considering whether "the relief provided for the class is adequate,"

17    the court should also take into account the following:

18                  (i) the costs, risks, and delay of trial and appeal;

19                  (ii) the effectiveness of any proposed method of distributing relief to
                     the class, including the method of processing class-member claims;
20

21                  (iii) the terms of any proposed award of attorney's fees, including
                     timing of payment; and
22                  (iv) any agreement required to be identified under Rule 23(e)(3).

23    *Id.* In addition to the two-step review process, Rule 23(e) also requires that: (i) the parties

24    seeking approval file a statement identifying the settlement agreement; (ii) class members be

25    given an opportunity to object; and (iii) no payment be made in connection with forgoing or

26    withdrawing an objection, or forgoing, dismissing, or abandoning an appeal. Fed. R. Civ. P.

27    23(e)(3), (5).

28    /////

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks and citations omitted).  To protect the rights of absent class members, Rule 23(e) requires that the court approve such settlements "only after a fairness hearing and a determination that the settlement is fair, reasonable, and adequate." *Id*. When approval is sought of a settlement negotiated before formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Id.*  In such circumstances, the "settlement approval requires a higher standard of fairness" and a "more exacting review" so as "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (internal quotation marks and citations omitted).  Rule 23 also "demand[s] undiluted, even heightened, attention" to the certification requirements when class certification is sought only for purposes of settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  Accordingly, the district court must examine the propriety of certification under Rule 23 both at this preliminary stage and at a later fairness hearing.  *See, e.g.*, *Ogbuehi v. Comcast*, 303 F.R.D. 337, 344 (E.D. Cal. Oct. 2, 2014).

## B.    PAGA Settlements

Under PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of himself and other current or former employees.  Cal. Lab. Code § 2699(a).[3]  A plaintiff suing under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009).  Thus, a judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Id.*

The PAGA statute imposes several limits on litigants.  First, because a PAGA action functions as a "substitute" for an action brought by the state government, a plaintiff suing under

---

[3]  An "aggrieved employee" is defined as "any person who was employed by the alleged violator against whom one or more of the alleged violations was committed . . . ."  Cal. Lab. Code § 2699(c)(1).

1   PAGA is limited to recovery of civil penalties only, rather than damages or unpaid wages

2   available privately through direct or class action claims.  *Iskanian v. CLS Transp. Los Angeles,*

3   *LLC*, 59 Cal. 4th 348, 381 (2014), *overruled on other grounds by Quach v. Cal. Com. Club, Inc*.,

4   16 Cal. 5th 562 (2024), *and abrogated on other grounds by Viking River Cruises, Inc. v.*

5   *Moriana*, 596 U.S. 639 (2022); *ZB, N.A. v. Superior Court*, 8 Cal. 5th 175, 182, 193 (2019), *rev'd*

6   *in part on other grounds by Viking River Cruises, Inc.*, 596 U.S. 639.  Second, to bring an action

7   under PAGA, an aggrieved employee must first provide written notice to the LWDA as well as to

8   the employer.  Cal. Lab. Code § 2699.3(a)(1).  Third, any civil penalties recovered must be

9   divided between the LWDA and the aggrieved employees.  *See* Cal. Lab. Code § 2699(i) (2016)

10  (requiring a 75%-25% apportionment); *id.* § 2699(m), (v)(1) (2024) (noting that the 2024

11  amendments, including the new 65%-35% apportionment requirement, apply only to "civil

12  action[s] brought on or after June 19, 2024").[4]  Fourth, and finally, the proposed settlement must

13  be submitted to the LWDA, and a trial court must "review and approve" any settlement of PAGA

14  claims.  *Id.* § 2699(s)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959,

15  971 (N.D. Cal. 2019) (citation omitted) (noting that because settling a PAGA claim

16  "compromises a claim that could otherwise be brought be the state," it requires that a court

17  "review and approve any settlement of any civil action pursuant to [PAGA]").

18      Although there is no binding authority setting forth the appropriate standard of review to

19  be employed for PAGA settlements, California district courts "have applied a Rule 23-like

20  standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and

21  reasonable in light of PAGA's policies and purposes.'"  *Haralson*, 383 F. Supp. 3d at 972

22  (quoting *Jordan v. NCI Grp., Inc.*, No. 16-cv-01701-JVS-SP, 2018 WL 1409590, at *2 (C.D. Cal.

23

---

24  [4]  Plaintiffs initiated this action on September 7, 2016 and provided notice to the LWDA in
    accordance with the PAGA on September 29, 2016.  (Doc. No. 218-1 at 7.)  Accordingly, the
25  court agrees with the parties that the 75%-25% apportionment of civil penalties between the
    LWDA and the Aggrieved Employees applies here, since the 2024 amendments do not apply
26  retroactively.  *Cf. Mendoza v. Movement Mortg., LLC*, No. 2:24-cv-03479-DAD-CSK, 2025 WL
    1646897, at *4 n.4 (E.D. Cal. June 11, 2025) ("For PAGA actions brought prior to June 19, 2024,
27  plaintiffs received 25% of the penalties and the LWDA received 75%. . . . Because this action
    was commenced after June 19, 2024, the 35% apportionment applies.").
28

9

1    Jan. 5, 2018)).  This standard is derived principally from the LWDA itself.  In commenting on a

2    proposed settlement including both class action and PAGA claims, the LWDA has offered the

3    following guidance:

4           It is thus important that when a PAGA claim is settled, the relief
            provided for under the PAGA be genuine and meaningful, consistent
5           with the underlying purpose of the statute to benefit the public and,
            in the context of a class action, the court evaluate whether the
6           settlement meets the standards of being "fundamentally fair,
            reasonable, and adequate" with reference to the public policies
7           underlying the PAGA.

8    *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's

9    guidance with approval).[5]  Recognizing the distinct issues presented by class actions, this court is

10   persuaded by the LWDA's reasoning cited by the district court in *O'Connor* and therefore adopts

11   its proposed standard in evaluating the PAGA portion of the settlement now before it.  *See, e.g.*,

12   *Castro v. Paragon Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *6 (E.D.

13   Cal. Apr. 27, 2020); *see also Bell v. Home Depot U.S.A., Inc.*, No. 2:12-cv-02499-DJC-CKD,

14   2025 WL 1557142, at *5 n.3 (E.D. Cal. June 2, 2025).  Accordingly, the court will approve a

15   settlement of PAGA claims upon a showing that the settlement terms:  (1) meet the statutory

16   requirements set forth by PAGA; and (2) are fundamentally fair, reasonable, and adequate in view

17   of PAGA's public policy goals.

18          When a proposed settlement involves overlapping class action and PAGA claims, courts

19   may employ a "sliding scale" in determining if the proposed settlement is "fundamentally fair,

20   reasonable, and adequate with reference to the public policies underlying the PAGA."  *O'Connor*,

21   201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*);

22   *McClure v. Brand Energy Serv., LLC*, No. 2:18-cv-01726-KJM-AC, 2021 WL 2168149, at *10

23   (E.D. Cal. May 27, 2021) (same); *Cooks v. TNG GP*, No. 2:16-cv-01160-KJM-AC, 2020 WL

24   5535397, at *9–10 (E.D. Cal. Sept. 15, 2020) (same).  As the district court in *O'Connor*

25   explained:

26   _____

27   [5]  The LWDA has also stated that it "is not aware of any existing case law establishing a specific
     benchmark for PAGA settlements, either on their own terms or in relation to the recovery on
     other claims in the action."  *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC, Doc. No.
28   736 at 2–3 (N.D. Cal. July 29, 2016).

> For example, if the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled.  By providing fair compensation to the class members as employees and substantial monetary relief, a settlement not only vindicates the rights of the class members as employees, but may have a deterrent effect upon the defendant employer and other employers, an objective of PAGA.  Likewise, if the settlement resolves the important question of the status of workers as employees entitled to the protection of the Labor Code or contained substantial injunctive relief, this would support PAGA's interest in "augmenting the state's enforcement capabilities, encouraging compliance with Labor Code provisions, and deterring noncompliance."

*Id.* at 1134–35 (quoting the LWDA's guidance).  At the same time, where "the compensation to the class amount[] is relatively modest when compared to the verdict value, the non-monetary relief is of limited benefit to the class, and the settlement does nothing to clarify [aggrieved workers' rights and obligations], the settlement of the non-PAGA claims does not substantially vindicate PAGA." *Id.* at 1135.  Finally, "where plaintiffs bring a PAGA representative claim, they take on a special responsibility to their fellow aggrieved workers who are effectively bound by any judgment." *Id.* at 1134.  Plaintiffs' special responsibility to other Aggrieved Employees is especially significant because "PAGA does not require class action procedures, such as notice and opt-out rights." *Id.*  Thus,

> [t]he Court must be cognizant of the risk that despite this responsibility, there may be a temptation to include a PAGA claim in a lawsuit to be used merely as a bargaining chip, wherein the rights of individuals who may not even be members of the class and the public may be waived for little additional consideration in order to induce the employer to agree to a settlement with the class.

*Id.*

# ANALYSIS

## A.    Preliminary Class Certification

As noted above, the previously assigned district judge granted class certification on February 5, 2018 and expanded that grant of class certification on January 15, 2019.  (Doc. Nos. 54, 85.)  However, the Settlement Agreement now before the court appears to modify or clarify to some extent the scope of class certification for purposes of the settlement.  (Doc. No. 218-3 at 45.)  For instance, the parties stipulate that "Objector and Conditional-Plaintiff-in-Intervention

11

1   Richard Martin is conditionally certified as a class representative for Settlement Purposes only,

2   and that Objectors-Intervenors' Counsel are certified as class counsel for the limited purposes of

3   obtaining the release of Martin's Labor Code section 6300 PAGA Claim and Overtime Class

4   Claim." (*Id.*)  Plaintiffs further state that prior class certification "should be granted, for purposes

5   of this Settlement only, as to all claims within the scope of the release set forth in Exhibit 2

6   hereto." (*Id.*)

7       Plaintiffs' pending motion argues that plaintiffs' counsel and Objectors' counsel

8   adequately represented the class during negotiations, bringing significant experience to this

9   matter.  (Doc. No. 218-1 at 17–18.)  Otherwise, plaintiffs' pending motion does not request or

10  support a request for any modification to the court's prior class certification orders.  (Doc. No.

11  218-1.)

12      The adequacy of representation Rule 23(a) prerequisite is satisfied if "the representative

13  parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

14  Resolution of this issue requires the court to address the following questions:  "(a) do the named

15  plaintiffs and their counsel have any conflicts of interest with other class members and (b) will

16  the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"

17  *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018); *see also Pierce v. County of*

18  *Orange*, 526 F.3d 1190, 1202 (9th Cir. 2008).  "Adequacy of representation also depends on the

19  qualifications of counsel."  *Sali*, 909 F.3d at 1007 (citation omitted).

20      Plaintiffs argue as follows regarding the qualifications of counsel:

21          Plaintiffs' Counsel is experienced in similar litigation, including
            considerable experience in class actions and wage and hour
22          litigation.  Matthew Eason has been practicing law since 1992 and
            has extensive experience in employment litigation, including
23          handling significant employment-related cases in multiple forums.
            Currently, well over 30% of his firm's practice is employment
24          related, almost exclusively representing employees. *See* Eason Decl.
            ¶¶ 7-9.  Timothy Del Castillo has practiced virtually exclusively
25          California employment law since being admitted to practice,
            including both individual and representative actions.  He has worked
26          on numerous class action cases in California since 2011, representing
            both employers and employees.  In addition, he previously worked
27          at prestigious international law firms including Akin Gump Strauss
            Hauer & Feld LLP and Orrick Herrington & Sutcliffe LLP, where he
28          handled numerous complex wage-and-hour class actions.  *See* Del

                                    12

1

2

3

4

Castillo Decl. ¶¶ 3-6. Both firms have successfully represented numerous clients in class and PAGA actions that have received court approval. *See* Eason Decl. ¶ 10; Del Castillo Decl. ¶ 10. Timothy Del Castillo's firm also has numerous class and representative actions pending. Del Castillo Decl. ¶ 11. Using this extensive experience, Class Counsel was able to adequately represent the class.

5

6

7

8

9

10

11

12

13

14

15

16

Similarly, Objectors' Counsel brings significant experience to this matter. Levi Lesches has been practicing law since 2015 and has served as lead or co-counsel in various significant cases. He has extensive experience in employment litigation and has recovered millions of dollars for single plaintiff and class members during his career. *See* Lesches Decl. ¶ 8. Mr. Lesches graduated cum laude from Pepperdine University School of Law, where he served as an associate editor for the Pepperdine University Law Review. His experience includes work at firms focused on plaintiff-side employment cases and serving as lead associate at Arendsen Cane Molnar LLP. *See* Lesches Decl. ¶¶ 9-10. He has successfully litigated numerous cases, including obtaining significant recoveries in plaintiff-side employment cases. *See* Lesches Decl. ¶ 11. I. Benjamin Blady brings over 30 years of experience, having graduated from UCLA in 1989 and Loyola Law School in 1992. He has focused his practice primarily on employment litigation since 1994, representing clients in class action, representative, and individual litigation. *See* Blady Decl. ¶ 13. He has served as plaintiffs and/or defense counsel on numerous significant class action suits involving wage and hour violations, misclassification claims, and other employment matters. *See* Blady Decl. ¶ 14. This extensive experience in employment litigation and class actions has enabled Objectors' Counsel to effectively evaluate and contribute to achieving a fair settlement for the Class.

17

18

19

20

(Doc. No. 218-1 at 17–18.) Plaintiffs further argue that the four separate mediations conducted at arms-length and the significant settlement award obtained for the class indicate that counsel has adequately represented the class. (*Id.* at 17.) Counsel also represent that they have no conflicts of interest with the class. (Doc. No. 218-2 at 2.)

21

22

23

24

25

26

Because counsel represent that there are no conflicts of interest with the Class Members, and counsel further appear to have considerable relevant experience, the court finds that plaintiffs' and Objectors-Intervenors' counsel have adequately represented the class. The parties are directed to specifically inform the court in their motion for final approval to what extent, if any, their requested class certification further diverges from the court's prior orders and to provide support for such modified certification.

27

/////

28

/////

13

**B.      Preliminary Settlement Approval**

Plaintiffs seek preliminary approval of the parties' proposed settlement.  Under Rule 23(e), a court may approve a proposed class action settlement only if it is a fair, reasonable, and adequate resolution of the dispute.  Fed. R. Civ. P. 23(e)(2); *Bluetooth*, 654 F.3d at 946. Preliminary approval is appropriate when "the court will likely be able to" give final approval under Rule 23(e)(2).  As such, "preliminary approval of a settlement has both a procedural and substantive component" and is appropriate if:  (1) the proposed settlement appears to be the product of serious, informed, non-collusive negotiations; and (2) the settlement falls within the range of possible approval, has no obvious deficiencies, and does not improperly grant preferential treatment to class representatives or segments of the class.  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079 (citation omitted); *see also* Fed. R. Civ. P. 23(e)(1)(B).  Because the proposed settlement has a PAGA component, it must also meet the statutory requirements under that act and be fundamentally fair, reasonable, and adequate in view of PAGA's public policy goals.

1.      The PAGA Component

PAGA requires that a proposed settlement be submitted to the LWDA.  Cal. Lab. Code § 2699(s)(2); *see also Haralson*, 383 F. Supp. 3d at 971 (citation omitted) (noting that a proposed settlement should be submitted to the LWDA to allow it to comment if it so desires).  Here, the parties uploaded a copy of the proposed settlement to the LWDA website on January 21, 2025. (Doc. No. 218-1 at 8.)[6]  In their motion for final approval, plaintiffs are directed to specify whether the LWDA has commented on the proposed settlement.  The court will continue to address the fairness, reasonableness, and adequacy of the PAGA penalties below.

/////

/////

---

[6]  The parties also have not clearly stated whether they submitted notice of the proposed settlement to the appropriate federal and state officials, as is required by the CAFA pursuant to 28 U.S.C. § 1715(b).  Under § 1715(b), each participating defendant must serve notice of the proposed settlement upon certain state and federal officials within ten days of the filing of the proposed settlement.  The parties are directed to inform the court in their motion for final approval whether and when they provided such notice in accordance with § 1715(b).

14

2.    Procedural Fairness

"The court must consider whether the process by which the parties arrived at their settlement is truly the product of arm's length bargaining and not collusion or fraud." *Haro v. Walmart, Inc*., No. 1:21-cv-00239-KES-SKO, 2025 WL 73109, at *10 (E.D. Cal. Jan. 10, 2025) (citing *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015)). "A settlement is presumed to be fair if it 'follow[s] sufficient discovery and genuine arm[']s-length negotiation.'" *Cavazos v. Salas Concrete Inc*., No. 1:19-cv-00062-DAD-EPG, 2022 WL 506005, at *13 (E.D. Cal. Feb. 18, 2022) (quoting *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012)). In addition, the parties' participation in mediation "tends to support the conclusion that the settlement process was not collusive." *Palacios*, 2015 WL 4078135, at *8 (citation omitted).

Here, as noted, the parties participated in four mediations spanning from 2017 to 2023 that were purportedly adversarial, though professional in nature. (Doc. No. 218-1 at 19.) The parties also engaged in substantial discovery. (*Id.*) Based on these representations, it appears that the Settlement Agreement was the result of fairly extensive negotiation between capable counsel and, accordingly, the court preliminarily concludes that the parties' negotiation constituted genuine, informed, and arm's-length bargaining.

3.    Substantive Fairness

a.    *Adequacy of the Settlement Amount*

In evaluating the fairness of a settlement award, "the settlement's benefits must be considered by comparison to what the class actually gave up by settling." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020) (citing *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to [the] process [of evaluating settlements] . . . is the need to compare the terms of the compromise with the likely rewards of litigation.")). However, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as amended* (June 19, 2000) (citation omitted). To determine whether a settlement "falls within the range of

15

1    possible approval," a court must focus on "substantive fairness and adequacy" and "consider

2    plaintiffs' expected recovery balanced against the value of the settlement offer." *Tableware*

3    *Antitrust Litig.*, 484 F. Supp. 2d at 1080.

4        The parties in this case have agreed to a $4,500,000.00 GSA. (Doc. No. 218-1 at 6.)

5    Assuming the various allocations described above are awarded in full, the net settlement amount

6    will be approximately $2,810,000.00. (*Id.* at 11.) The entire net settlement amount will be

7    distributed to the Class Members on a proportional and non-reversionary basis.[7] (*Id.* at 11.)

8        Plaintiffs retained an independent economic data analyst, Nick Briscoe of Briscoe

9    Economics Group, to assist with creation of potential damages analyses in anticipation of the

10    fourth and final mediation. (Doc. No. 218-3 at 12.) With the help of Mr. Briscoe and based on

11    analysis and review of relevant documents and information on the class, plaintiffs' counsel

12    determined that a generous likely total exposure for the asserted claims in this case, plus related

13    statutory and civil penalties, without any reduction for risk of loss or reduction in PAGA penalties

14    is approximately $22,545,996, not including interest. (*Id.*) The gross settlement amount of

15    $4,500,000 represents approximately 19.96% of the estimated likely maximum recovery. (Doc.

16    No. 218-3 at 13.) The net settlement amount of $2,810,000 represents approximately 12.46% of

17    plaintiffs' maximum potential recovery. This proportion is certainly in the range of the

18    percentage recoveries that California district courts—including this one—have found to be

19    reasonable. *See, e.g.*, *Singh v. Roadrunner Intermodal Servs., LLC*, No. 1:15-cv-01497-DAD-

20    BAM, 2019 WL 316814, at *5 (E.D. Cal. Jan. 24, 2019) (holding that the "amount offered in

21    settlement . . . weigh[ed] in favor of final approval" where the net settlement amount of

22

23    ---

[7] The parties propose that unclaimed funds be paid to a *cy pres* recipient as agreed upon by the
24    parties, subject to court approval, or to the California State Controller Unclaimed Property
Division in the name of the Qualified Claimant. (Doc. No. 218-1 at 11.) "[A] district court
25    should not approve a *cy pres* distribution unless it bears a substantial nexus to the interests of the
class members— . . . the *cy pres* remedy 'must account for the nature of the plaintiffs' lawsuit,
26    the objectives of the underlying statutes, and the interests of the silent class members[.]'" *Lane*,
696 F.3d at 821. In their motion for final approval, plaintiffs are directed to specify the proposed
27    *cy pres* recipient and explain why the specified recipient should be approved by the court.
Otherwise, the court will direct that unclaimed funds be paid to the California State Controller
28    Unclaimed Property Division in the name of the Qualified Claimant.

1    $5,868,517.01 accounted for almost 7.6% of the maximum damages available as to the plaintiffs'

2    core claims); *Coppel v. SeaWorld Parks & Ent., Inc.*, No. 21-cv-01430-RSH-DDL, 2025 WL

3    1346873, at *5 (S.D. Cal. May 8, 2025) (preliminarily approving a settlement where the GSA

4    "equals approximately 11.5% of the maximum potential recovery"); *In re Splunk Inc. Sec. Litig.*,

5    No. 20-cv-08600-JST, 2024 WL 923777, at *6 (N.D. Cal. Mar. 4, 2024) (finding "the percentage

6    of recovery fair and reasonable" where "the settlement represents between approximately 5% and

7    20.5% of the realistic maximum damages for the Settlement Class"); *In re Omnivision Techs.,

8    Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving a settlement where the GSA

9    accounted for approximately 9% of the maximum potential recovery, and after accounting for

10   attorneys' fees and costs, the net settlement gave plaintiffs about 6% of their maximum potential

11   recovery).  In addition, the recovery anticipated by the parties' proposed settlement would be

12   allocated such that employees will receive payouts that scale with their number of weeks worked.

13   (Doc. No. 218-1 at 11.)

14        Plaintiffs assert that the settlement amount is fair, adequate, and reasonable considering

15   "substantial litigation risks and potential delays."  (*Id.* at 20.)

16         Among the risks included:  (1) employees were permitted to leave
       Defendant's facility for breaks; (2) class certification challenges due
17     to variations in paging frequency between different positions and
       shifts, which could lead to decertification; (3) possible failure to
18     prove liability even if the court found meal/rest break violations,
       which would have also eliminated derivative claims for waiting time
19     penalties and wage statement violations; (4) risk that wage statement
       errors would not be found "knowing and intentional" under Labor
20     Code § 226(e)(1); and (5) risk of failing to prove willfulness for
       waiting time penalties under Labor Code §203.  Moreover, given the
21     complexity and unsettled nature of the issues in the case, it is likely
       any outcome of trial would have resulted in a lengthy and costly
22     appeal.

23   (*Id.* at 20–21.)

24        The court also observes that $7,223.65, the amount that the average Class Member can

25   expect to receive under the proposed settlement, is significant given the plaintiffs' hourly pay rate

26   of $26 to $48.  (Doc. Nos. 218-1 at 19; 218-2 at 3–4, 12); *see Mondrian v. Trius Trucking, Inc.*,

27   No. 1:19-cv-00884-DAD-SKO, 2022 WL 2306963, at *15 (E.D. Cal. June 27, 2022) (noting that

28   /////

an average settlement award of $1,239.00 is significant for employees who typically earn $25.16 per hour).

While "a larger award was theoretically possible, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.'" *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal citations and quotation marks omitted)). For all of these reasons, the court will preliminarily approve the settlement amount reflected in the parties' proposed settlement as being adequate.

### b.   *PAGA Penalties*

The settlement also provides for $100,000.00 in civil PAGA penalties. (Doc. No. 218-1 at 10.) Pursuant to the PAGA before its recent amendment, 75% of the civil penalties, or $75,000.00, will go to the LWDA, and 25%, or $25,000.00, will be included in the net settlement amount and payable to Aggrieved Employees. (*Id.*) *See* Cal. Lab. Code § 2699(i) (2016) (requiring a 75%-25% apportionment); *id.* § 2699(m), (v)(1) (2024) (noting that the 2024 amendments, including the new 65%-35% apportionment requirement, apply only to "civil action[s] brought on or after June 19, 2024").[8]

The $100,000.00 allocated towards civil penalties represents 2.2% of the $4,500,000.00 GSA. The amount proposed to settle plaintiffs' PAGA claims is also consistent with other PAGA settlements approved by this court. *See Syed v. M-I, LLC*, No. 1:12-cv-01718-DAD-MJS, 2017 WL 714367, at *13 (E.D. Cal. Feb. 22, 2017) (approving $100,000.00 in PAGA penalties for a California class with a $3,950,000.00 GSA). The court therefore preliminarily concludes that the settlement of plaintiffs' PAGA claims is fair, reasonable, and adequate in light of the PAGA's public policy goals. *See O'Connor*, 201 F. Supp. 3d at 1133.

### c.   *Attorneys' Fees*

When a negotiated class action settlement includes an award of attorneys' fees, the district court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is

---

[8] The parties are directed to inform the court in their motion for final approval what portion of the estimated potential damages are attributable to PAGA penalties.

reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941; *see also Knisley v. Network Assocs., Inc.*, 312 F.3d 1123, 1125 (9th Cir. 2002) (citation omitted). Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (citation omitted). As a result, the district court must assume a fiduciary role for the class members and "act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is." *Id.* (internal quotation marks and citations omitted).

In evaluating the award of attorneys' fees, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *Bluetooth*, 654 F.3d at 942 (citations omitted). Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the court may award class counsel a percentage of the common fund recovered for the class; in the Ninth Circuit, the benchmark as to such fees is 25%. *Id.*; *see also Bluetooth*, 654 F.3d at 942; *Norton v. Strategic Staffing Sols., L.C.*, No. 3:23-cv-06648-JSC, 2025 WL 1666143, at *8 (N.D. Cal. June 12, 2025) ("The Ninth Circuit uses a 25 percent of the fund 'benchmark' for awarding fees."). Special circumstances that could justify varying the benchmark award include when counsel achieves exceptional results for the class, undertakes extremely risky litigation, generates benefits for the class beyond simply the cash settlement fund, or handles the case on a contingency basis. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015). An explanation is necessary when the court departs from the 25% benchmark, *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir. 2000), but either way, "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002).

/////

19

1         Under the lodestar method, the court multiples the number of hours the prevailing party

2   reasonably spent litigating the case by a reasonable hourly rate for counsel. *Bluetooth*, 654 F.3d

3   at 941. The product of this computation, the "lodestar" amount, yields a presumptively

4   reasonable fee. *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013). The

5   Ninth Circuit has recommended that district courts apply one method but then cross-check the

6   appropriateness of the determined amount by employing the other as well. *See Bluetooth*, 654

7   F.3d at 944. This diligence is particularly important when "counting *all* hours expended," in a

8   case "where the plaintiff has achieved only limited success," would yield an "excessive amount"

9   of fees, or when awarding a percentage of a "megafund would yield windfall profits for class

10  counsel in light of the hours spent on the case." *Id.* at 942; *see also id.* at 945 ("Just as the

11  lodestar method can confirm that a percentage of recovery amount does not award counsel an

12  exorbitant hourly rate, the percentage-of-recovery method can likewise be used to assure that

13  counsel's fee does not dwarf class recovery.") (internal quotation marks and citations omitted).

14  Similarly, an upward adjustment may be justified if the recovery is "too small . . . in light of the

15  hours devoted to the case or other relevant factors." *Six (6) Mexican Workers v. Arizona Citrus*

16  *Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

17        Here, the settlement provides that Class counsel will seek an award of $1,500,000.00

18  equivalent to 33.33% of the GSA. (Doc. No. 218-1 at 21.) That amount is higher than the 25%

19  benchmark established in the Ninth Circuit, *Bluetooth*, 654 F.3d at 942, but certainly not an

20  uncommon percentage for wage and hour class actions litigated in the Eastern District of

21  California. *See Barbosa*, 297 F.R.D. at 450 (listing cases where courts approved attorneys' fees

22  of approximately one-third of the total settlement). The proposed Settlement Agreement also

23  provides for costs not exceeding $45,000. (Doc. No. 218-1 at 21.)

24        In explaining their proposed departure from the 25% benchmark, plaintiffs' counsel state

25  that "[t]his case involved complex and lengthy litigation spanning nearly nine years, with counsel

26  conducting extensive discovery including 24 class member depositions, and the matter becoming

27  even more complex when the Objector[s]-Intervenor[s] raised additional claims." (*Id.* at 26.)

28  "Moreover, the combined efforts of Plaintiffs' Counsel and Objectors' Counsel proved highly

1    effective – while Plaintiffs' Counsel initially secured a substantial $2.45 million settlement

2    through years of litigation, the addition of Objectors' Counsel helped nearly double the gross

3    settlement amount to $4.5 million." (*Id.* at 26–27.) "And counsel obtained significant non-

4    monetary benefits through policy changes regarding both paging systems and hazardous materials

5    procedures that will help prevent future violations." (*Id.* at 27.) "These substantial results [were]

6    achieved through persistent litigation efforts over many years on a contingency basis[.]" (*Id.*)

7          Considering the significant relief obtained for Class Members after nine years of complex

8    litigation on a contingency basis, the court accepts a measured departure from the benchmark

9    percentage at this preliminary approval stage of the litigation. At the final approval stage,

10   however, the court will carefully re-examine the award of attorneys' fees and conduct a final

11   lodestar cross-check. At that point, the court will expect plaintiffs' counsel to provide the

12   requisite billing records and calculations for cross check purposes and in justifying the fees they

13   seek.[9] *See Fischel*, 307 F.3d at 1006–08 (noting that a district court has discretion to adjust a

14   lodestar upward or downward, including by way of a multiplier, based on certain reasonableness

15   factors); *Bluetooth*, 654 F.3d at 941–42 (same). Additionally, plaintiffs' counsel must provide an

16   accounting or invoices documenting the requested $45,000.00 in litigation expenses at the final

17   approval stage.

18          d.    *Incentive Payment*

19          While incentive awards are "fairly typical in class action cases," they are discretionary

20   sums awarded by the court "to compensate class representatives for work done on behalf of the

21   class, to make up for financial or reputational risk undertaken in bringing the action, and,

22   sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W.*

23   *Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009); *see also Staton v. Boeing Co.*, 327 F.3d 938,

24   977 (9th Cir. 2003) ("[N]amed plaintiffs . . . are eligible for reasonable incentive payments.").

25   Such payments are to be evaluated individually, and the court should look to factors such as "the

26   ―――――――――――――――

27   [9] "Though the court may well grant an award of that size under certain circumstances, the court
     cannot abdicate its obligation to protect the rights of absent members by simply defaulting to the
     method [of determining attorneys' fees] proffered by plaintiffs." *Perez v. All Ag, Inc.*, No. 1:18-

28   cv-00927-DAD-EPG, 2020 WL 1904825, at *9 (E.D. Cal. Apr. 17, 2020).

1    actions the plaintiff has taken to protect the interests of the class, the degree to which the class has

2    benefitted from those actions . . . the amount of time and effort the plaintiff expended in pursuing

3    the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." *Staton*, 327 F.3d at 977

4    (citation omitted).

5         The named plaintiffs and objectors-intervenors in this action have requested incentive

6    payments of $10,000.00 each.  (Doc. No. 218-1 at 10.)  "Throughout the litigation, Plaintiffs'

7    Counsel worked closely with the named Plaintiffs Robert Westfall, David Anderson, Lynn Bobby

8    and David Ellinger to gather data about Defendant and its employment practices, participate in

9    discovery and inform the litigation strategy."  (*Id.* at 23.)  "Furthermore, the Objectors'

10   Participation resulted in nearly doubling the settlement amount."  (*Id.*)  "Plaintiff Robert Westfall

11   participated in four mediations while the other named Plaintiffs participated in the third

12   mediation, and all were available for the fourth mediation."  (*Id.*)  "Likewise, Objectors Martin

13   and Bernstein also attended the entire mediation and participated in the litigation."  (*Id.*)

14        As noted, under the proposed settlement, the average Class Member will receive

15   $7,223.65.  (*Id.* at 19.)  Thus, proposed incentive awards of $10,000 are roughly 1.4 times the

16   average amount each putative Class Member could expect to receive from the proposed

17   settlement.  The Ninth Circuit has repeatedly urged district courts to be "vigilant in scrutinizing

18   all incentive awards to determine whether they destroy the adequacy of the class representatives."

19   *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013) (citation omitted); *see*

20   *also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 941–43 (upholding district court's

21   determination that awarding $5,000 each to nine class representatives was appropriate even

22   though objectors argued it was significantly larger than the $12 each unnamed class member

23   would receive).

24        Having reviewed the proposed $10,000.00 incentive awards for the named plaintiffs and

25   objector-intervenors, the court will preliminarily approve the proposed incentive awards.[10]

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27   [10]  Plaintiffs have provided the court with the average award expected from the settlement but
     have not provided the court with estimates regarding the expected median, minimum, or
     maximum awards.  Plaintiffs are directed to provide this information in their motion for final

28   approval.

e.     *Release of Claims*

Plaintiffs' proposed Settlement Agreement includes an exhibit entitled Release of Claims by Class wherein the parties agree that the named plaintiffs, objectors-intervenors, and all eligible class members release defendant and certain related individuals and entities from claims arising from or that could have reasonably been asserted based on the allegations of the complaint for various labor code violations.  (Doc. No. 218-3 at 151–52.)  Unless they opt out, the members of the Settlement Class are deemed to have specifically and knowingly agreed to the waiver and release of claims set forth by the parties in their agreement.  (*Id.* at 152.)  While not clearly stated, the court infers from this that the parties intend for all Aggrieved Employees to be subject to the release of the PAGA claims, whether or not they opt-out of the Class.  *See Sakkab v. Luxottica Retail North Am., Inc*., 803 F.3d 425, 436 n.10 (9th Cir. 2015) ("A judgment in a PAGA action binds absent employees because it binds the government agency tasked with enforcing the labor laws."); *O'Connor*, 201 F. Supp. 3d at 1134 (noting that fellow aggrieved workers are "effectively bound by any judgment" and that "PAGA does not require class action procedures, such as notice and opt-out rights").

Plaintiffs' pending motion for preliminary approval contains little regarding release of claims except that "for Class Members that do not timely opt out of the Settlement, the General Release shall release their claims for waiting time penalties to the extent predicated on any wages paid prior to April 20, 2024."  (Doc. No. 218-1 at 12.)  The court will preliminarily approve the release of claims provision, but the parties are directed to clearly state their intentions as to the release of claims along with any additional authority supporting the scope of that release, including the release of unknown claims, in their motion for final approval.

**C.     Prior Issues**

As noted above, the parties previously received preliminary approval but were denied final approval of their earlier settlement agreement.  (Doc. No. 134.)  The court identified issues with the administration of that settlement, including that the administrator reported that he received no requests for opt-outs or objections as of May 17, 2022, but the Objectors presented evidence that they had submitted timely objections and that the administrator received those

objections in early April 2022.  (*Id.* at 2.)  The administrator also mailed notice packets (and

revised notice packets) that provided for an insufficient number of days to opt out or object to the

settlement, sent Objector Martin's notice packet to the wrong address despite having Martin's

correct address on file, and did not submit his declaration to the court until four days before the

hearing on the motion for final approval.  (*Id.* at 2–3.)  The parties' failure to notify the court of

Objector Martin's seemingly related case against defendant also raised significant concerns on the

part of the court.  (*Id.* at 3.)  Given the issues described above, the court found that it did not have

sufficient facts before it to intelligently consider approval of the settlement agreement.  (*Id.*)  The

court ruled that the Objectors were entitled to discovery related to "(1) why objections and opt-

outs were not reported to the court, (2) why the *Martin* lawsuit was not reported to the court as a

related case, (3) whether notices were mailed properly, (4) whether there are other unreported

objections and/or opt-outs, and (5) whether the settlement waives valuable claims unfairly or

without adequate consideration."  (*Id.*)  The court stated that such discovery was to be completed

by October 7, 2022.  (*Id.*)

Plaintiffs' renewed motion for preliminary approval seeks approval of a different

Settlement Administrator than the one responsible for many of the issues identified above.  The

newly proposed Settlement Administrator is ILYM.  (Doc. No. 104 at 13.)  Further, following a

substantial increase in the GSA, Objector-Intervenors now agree to the parties' Settlement

Agreement, including the release of claims.  (Doc. No. 218-2 at 3.)  Therefore, the court finds that

the issues that plagued the parties' prior settlement agreement are unlikely to arise in the context

of the currently proposed Settlement Agreement.

**D.    Proposed Class Notice and Administration**

For proposed settlements under Rule 23, "the court must direct notice in a reasonable

manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1); *see

also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998), *overruled on other grounds

by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ("Adequate notice is critical to court

approval of a class settlement under Rule 23(e).").  For a class certified under Federal Rule of

Civil Procedure 23(b)(3), the notice must contain, in plain and clear language:  (1) the nature of

1    the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) the

2    right of a class member to appear through an attorney, if desired; (5) the right to be excluded from

3    the settlement; (6) the time and manner for requesting an exclusion; and (7) the binding effect of a

4    class judgment on members of the class.  Fed. R. Civ. P. 23(c)(2)(B).  A class action settlement

5    notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to

6    alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill*

7    *Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (internal quotation marks and citations

8    omitted).

9         According to the parties' proposal, within forty-five days of the defendant's receipt of

10    notice of entry of preliminary approval, defendant will cause to be delivered to the Class

11    Administrator a list of the Class Members that includes their names, last known address(es), full

12    social security numbers, dates of employment with defendant, and the last rate of pay.  (Doc. No.

13    218-3 at 48.)  The Class Administrator will then determine the number of engineering Class

14    Member work weeks and Class Member work weeks worked by each Class Member.  (*Id.*)

15    Within thirty days of the delivery of the information described above, the class administrator will

16    mail a Notice Packet to each Class Member via United States Mail, first class, postage pre-paid.

17    (*Id.*)  Estimated calculations will be included in the notices on an individual basis.  (*Id.* at 48–49.)

18    If mailed Notice Packets are returned undeliverable, the Class Administrator will perform one

19    skip trace and re-mail the Notice Packet to any new addresses disclosed by such search.  (*Id.* at

20    49.)

21         A review of the Class Notice confirms it provides adequate information regarding the

22    nature of the litigation, the essential terms of the settlement, how a Class Member would object to

23    the settlement, and how a Class Member would request to be excluded from the settlement.  (*Id.*

24    at 196–201.)  The Class Notice also identifies the Class and Objectors-Intervenors counsel;

25    specifies the amounts that will be sought for the named plaintiffs' and Objectors-Intervenors'

26    incentive payments and counsel's fees and expenses; and explains how to obtain additional

27    information.  (*Id.* at 200, 202.)  The Class Notice also adequately informs the Class Members of

28    the scope of the Released Claims.  (*Id*. at 199–200.)

1    The court finds that the notice and the manner of notice proposed by plaintiffs meet the

2    requirements of Federal Civil Procedure Rule 23(c)(2)(B) and 29 U.S.C. § 216(b) and that the

3    proposed mail delivery is appropriate under these circumstances.

4    **E.    Settlement Administrator and Settlement Administration Costs**

5    As stated previously, the parties have agreed to retain ILYM to handle the notice and

6    claim administration process and request that ILYM be appointed to serve as the Settlement

7    Administrator.  (Doc. No. 218-3 at 31.)

8    The estimated cost of administering this settlement is "not to exceed $10,000[,]" which

9    will be deducted from the GSA.  (Doc. No. 218-1 at 2, 10.)  This estimate is reasonable when

10   compared with administration fees proposed in other settlements submitted to this court.  *See,*

11   *e.g.*, *Mondrian*, 2022 WL 2306963, at *21 (administration costs of "less than $15,000" for a

12   $995,000 settlement); *Castro*, 2020 WL 1984240, at *19 (administration costs of $15,000 for a

13   $3.75 million settlement); *Gonzalez v. CoreCivic of Tennessee, LLC*, No. 1:16-cv-01891-DAD-

14   JLT, 2020 WL 1475991, at *14 (E.D. Cal. Mar. 26, 2020) (administration costs of $15,000 for a

15   $3.2 million settlement); *Dakota Med., Inc. v. RehabCare Grp., Inc.,* No. 1:14-cv-02081-DAD-

16   BAM, 2017 WL 1398816, at *5 (E.D. Cal. Apr. 19, 2017) (administration costs of $94,000 for a

17   $25 million settlement); *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017

18   WL 117789, at *7 (E.D. Cal. Jan. 11, 2017) (administration costs of $45,000 for a $4.5 million

19   settlement).

20   The court will appoint ILYM as the Settlement Administrator.

21   **F.    Implementation Schedule**

22   The court sets the following implementation schedule, which is based on timelines set out

23   in the Settlement Agreement:

| Event | Date |
|---|---|
| Deadline for defendant to provide ILYM with a spreadsheet containing Class Member contact information and data necessary to calculate settlement shares | No later than 45 days after defendant receives notice of entry of this order granting preliminary approval |

26

| Deadline for ILYM to mail Class Notices to all Class Members | No later than 30 days after ILYM receives Class Member contact information and settlement share data from defendant |
|---|---|
| Deadline for Class Members to challenge weeks worked information | No later than 45 days after ILYM mails the Class Notices to all Class Members |
| Deadline for Class Members to send to ILYM any objections regarding the settlement | No later than 45 days after ILYM mails the Class Notices to all Class Members |
| Deadline for ILYM to forward objections to Class Counsel and defendant's counsel | Within 1 business day of receipt of the Class Member Objection |
| Deadline for Class Members to postmark requests for exclusion from the settlement | No later than 45 days after ILYM mails the Class Notices to all Class Members |
| Deadline for ILYM to provide counsel with the Class Administrator Declaration | No later than 30 days after the expiration of all time periods provided for in sections 2.5, 2.6, and 2.7 of the Settlement Agreement |
| Deadline for plaintiffs to file a motion for final approval, including request for attorneys' fees, costs, and enhancement award, and along with copies of all Class Member Objections | 35 days prior to the Final Approval Hearing[11] |
| Final Approval Hearing | May 4, 2026 at 1:30 p.m.[12] |

---

[11]  Plaintiffs' proposed order states instead that this deadline be set for 16 court days before the Final Approval Hearing.  (Doc. No. 218-7 at 4.)  This deadline does not match the deadline provided for in the parties' Settlement Agreement and does not conform to Local Rule 230(b). (Doc. No. 218-3 at 55.)  Furthermore, the Settlement Agreement provides for a deadline of the later of 10 days after Class Counsel's receipt of the Class Administrator Declaration or 35 days prior to the Final Approval Hearing.  (*Id.*)  This deadline also does not conform to Local Rule 230(b).  The court has therefore set a deadline in conformance with Local Rule 230(b).

[12]  The parties did not propose a date for the Final Approval Hearing.  Should the parties wish to request an alternative hearing date to the one selected by the court, the parties are instructed to request that alternative hearing date well in advance of the mailing of the Class Notices.

| Deadline for Class Administrator to establish all financial accounts necessary to establish the Qualified Settlement Fund and to notify all counsel that such accounts have been established and of the payment details necessary to fund the Qualified Settlement Fund | Forthwith upon the date the Final Approval Order becomes final ("Effective Date") |
|---|---|
| Deadline for defendant to deposit settlement amount with Settlement Administrator | No later than 30 days after the receipt of notice from the Class Administrator that accounts have been established and of the payment details necessary to fund the Qualified Settlement Fund |
| Deadline for Settlement Administrator to issue checks to Class Members and Aggrieved Employees | No later than 10 days after receipt of the Gross Settlement Amount and no later than 60 calendar days after the Effective Date |
| Deadline for Settlement Administrator to file proof of payment of settlement awards, enhancement, award, attorneys' fees and costs | 120 days after Effective Date |
| Deadline for recipients to cash settlement checks | 180 days from the date it is issued or re-issued (if the initial check is returned as a result of an incorrect address) |

In addition to the dates identified in this implementation schedule, the parties and ILYM are instructed to follow the remaining dates and time restrictions identified in the Settlement Agreement. (Doc. No. 218-3.)

**CONCLUSION**

For the reasons explained above:

1.    Plaintiffs' motion for preliminary approval of class action settlement (Doc. No. 218) is GRANTED;

2.    Plaintiff's request for status (Doc. No. 221) is DENIED as having been rendered moot by this order;

3.    The court preliminarily confirms and appoints plaintiffs Robert Westfall, David E. Anderson, Lynn Bobby, and David Ellinger, and Objectors Richard Martin and Andre Bernstein as the Class Representatives for settlement purposes;

/////

28

4.      The court preliminarily confirms and appoints Timothy B. Del Castillo and
Spencer S. Turpen of Castle Law: California Employment Counsel, PC; Matthew
R. Eason and Erin Scharg of Eason & Tamborini, ALC; Levi Lesches of Lesches
Law; and I. Benjamin Blady of Blady Workforce Law Group LLP as Class
Counsel for settlement purposes;

5.      ILYM is APPROVED as the Settlement Administrator;

6.      The proposed Class Notice (Doc. No. 218-3 at 196–202) is APPROVED in
accordance with Federal Rule of Civil Procedure 23;

7.      Before sending out the Class Notice, the court DIRECTS the parties or ILYM to
fill in all blank or bracketed placeholders in the Class Notice with the appropriate
information;

8.      The proposed settlement detailed herein is APPROVED on a preliminary basis as
fair and adequate;

9.      The hearing for final approval of the proposed settlement is SET for Monday, May
4, 2026 at 1:30 p.m. before the undersigned in Courtroom 4, with the motion for
final approval of class action settlement to be filed at least 35 days in advance of
the final approval hearing, in accordance with Local Rule 230(b); and

10.     The settlement implementation schedule set forth above is ADOPTED.

IT IS SO ORDERED.

Dated:   **September 25, 2025**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE